## Nannie M. Bryan, Appellant, v. Chicago Herald Company et al., Appellees.

### Gen. No. 15,430.

INSTRUCTIONS—*what considered in passing upon motion for peremptory.* In passing upon a motion for a peremptory instruction the question of the preponderance of the evidence does not arise nor is the court concerned with the weight of the evidence introduced. The fact that different inferences might fairly be drawn from the facts and circumstances shown in evidence is not material. It is only where there is no evidence whatever produced on some material point to sustain a verdict that a court is justified in refusing to submit the case to a jury, and giving a peremptory instruction to find for the defendant.

Action on the case. Appeal from the Circuit Court of Cook county; the Hon. E. M. MANGAN, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1909. Reversed and remanded. Opinion filed May 5, 1911. Rehearing denied May 19, 1911.

**Statement by the Court.** This is an action on the case brought by Nannie M. Bryan, appellant, against the Chicago Herald Company, a corporation, and Alexander A. McCormick, appellees, to recover damages for malicious prosecution.

At the conclusion of the plaintiff's evidence, on the trial of the case, the defendants moved for a directed verdict on the ground that the evidence failed to show the connection of the defendants with the malicious prosecution alleged in the declaration and shown by the evidence. The motion was allowed, and the court instructed the jury to find the defendants not guilty. Judgment was entered upon the verdict in favor of appellees and against appellant for costs of suit. This appeal is prosecuted to reverse that judgment.

From the record, it appears that Nannie M. Bryan, appellant, plaintiff below, is the wife of William S. Bryan, and on October 7, 1902, and for many years prior to that time, the plaintiff lived with her husband and children in the city of St. Louis, Missouri. Mr. Bryan was engaged in the publishing business in that city, and was also an author, and shortly after the Spanish-American War, wrote a work called, "Our Islands and their People." On March 29, 1899, he entered into a contract with the N. D. Thompson Publishing Company of St. Louis, by the terms of which they were to publish this work in two volumes, at their expense, and Mr. Bryan was to receive one-third of the net profits. There was a large demand for the book, and thousands of volumes were sold over the country.

The Chicago Herald Company, appellee, is an Illinois corporation, and owns and publishes the Chicago Record-Herald. Alexander A. McCormick, appellee, and defendant below, was, during the time of the transaction in question, secretary and general manager of the Chicago Herald Company. He had sole charge of the transaction for the Chicago Herald Com-

pany regarding the delivery of certain of its notes to Mr. Thompson of the N. D. Thompson Publishing Company, out of which the malicious prosecution grew.

It appears that the Chicago Herald Company bought the books called "Our Islands and their People," written by Mr. Bryan and published by the N. D. Thompson Company, in large numbers, and paid for them by giving its notes. The agreement between the Chicago Herald Company and the N. D. Thompson Publishing Company was that the Chicago Herald Company was to have twelve months' time in which to pay for the books, but it appeared that six months' paper was given, because it would be more readily discounted at the banks, with the agreement that when paper matured it was to be replaced by other notes of the Herald Company, running for six months, with interest.

It further appears that on October 7, 1902, the N. D. Thompson Publishing Company had in its possession three promissory notes made payable to its order and signed by the Chicago Herald Company, aggregating $10,800. These notes were given in payment of books already received. Mr. Thompson had been trying to discount these notes in St. Louis from September 23, 1902, until October 7, 1902, but without success. On the latter date Mr. Lillingston, secretary of the N. D. Thompson Publishing Company, gave the notes to Mr. Bryan, requesting him to discount them at his bank. Nothing was said to Mr. Bryan as to whose notes they were. Mr. Bryan endorsed the notes on the day he received them, and discounted them at his bank in St. Louis, and the proceeds thereof were placed to his credit. He had never discounted any paper of the Chicago Herald Company before. The notes were left by him with the bank for discount about the middle of the day. He did not learn that they had been discounted, and the proceeds passed to his credit, until about three o'clock of that day. In the meantime he learned that the N. D. Thompson Publishing Company

was about to make an assignment. Up to that time he had received nothing whatever from the N. D. Thompson Company on account of his books, and he learned that there was due him about $46,000 from that company.

Shortly before this transaction Bryan had been told that the sale of his book had reached a total of about $700,000, and, therefore, that the profits amounted to a very large sum, of which Mr. Bryan was entitled to an amount over $46,000. In addition to this there were other outstanding notes which Mr. Bryan had endorsed for Mr. Thompson as an accommodation, to the amount of $4,400, for which, with the so called Herald notes which he had discounted on that day, amounting to $10,800, he was liable on his endorsement for Thompson's benefit, amounting to about $15,000. Mr. Bryan had no way of protecting himself either on the endorsements or on the profits due him from the publication of the work, and, acting on the advice of his attorney, he at once notified the Thompson Publishing Company that he had retained the proceeds of the three notes discounted on that day, and applied the same on account of the indebtedness due him from the Thompson Publishing Company. On the second day after the notes were discounted, the Thompson Publishing Company made an assignment.

On October 11, 1902, or about four days after the notes had been discounted, Mr. Bryan met Mr. A. A. McCormick on the street in St. Louis. Mr. J. W. Corley, general sales agent for the Thompson Publishing Company, who was with McCormick, introduced McCormick to Bryan, stating that McCormick was the manager of the Chicago Herald Company, and had come to St. Louis to see about these notes, and that he was going to have blood or money. Later on, the same day, Mr. Bryan went to the office of his attorney, Mr. Sullivan, and there met Mr. McCormick and Mr. Robert, a St. Louis lawyer, representing the Chicago Herald Company. McCormick stated at that inter-

view that the money realized upon the notes discounted belonged to the Chicago Herald Company. Mr. Robert also made a similar statement, and demanded that Mr. Bryan pay over the money. Upon Bryan declining to do so, Robert stated that unless he did they would prosecute him and his wife in the civil and criminal courts. Mr. Bryan stated to Mr. Robert and Mr. Mc-Cormick his relations with the Thompson Publishing Company, and that the company was greatly indebted to him, and that he was liable on endorsements for their accommodation on paper to the extent of $15,000; that he had retained the proceeds of the notes to protect himself against this liability and that he had not known the Chicago Herald Company in the transaction at all. This conversation occurred on Friday or Saturday, and on the following Sunday Mr. McCormick went out to Mr. Bryan's residence and had a long conversation with him in regard to the notes, and Mr. Bryan explained fully his reasons for keeping the proceeds, informing Mr. McCormick that the notes had been delivered to him without any notice of any interest or pretended interest of the Herald Company in them, and that he had endorsed the notes and discounted them at his bank, and had drawn the proceeds out under the advice of his attorney, because the Thompson Publishing Company had made an assignment. He also again stated that there were other notes outstanding which he had endorsed for Mr. Thompson's accommodation, to the amount of $4,400, and that the Thompson Publishing Company owed him in the neighborhood of $46,000 on account of his books. Mr. McCormick claimed that the notes belonged to the Chicago Herald Company, and that they were going to have the money if they had to prosecute Bryan and his wife to the end of the law in both the civil and criminal courts.

On the day following the Chicago Herald Company brought a civil suit against Bryan to recover the amount of the proceeds of the notes and subsequently

obtained judgment therefor, which was later reversed by the Supreme Court of Missouri.

On November 30, 1902, the Chicago Herald Company procured the indictment of Mr. Bryan for the embezzlement of the notes or their proceeds, on the trial of which Mr. Bryan was acquitted.

After the judgment was obtained by the Chicago Herald Company against Mr. Bryan in the lower court, and before the Supreme Court had reversed it, a garnishment suit was brought on the judgment against Nannie M. Bryan, this appellant. This suit came up on June 18, 1903, for trial and Mrs. Bryan was ordered to pay the money into court by ten o'clock on Monday, June 22, 1903, and some days thereafter judgment was entered against her as garnishee. This judgment was later reversed by the Supreme Court of Missouri.

On June 20, 1903, the criminal prosecution set out in the declaration in this case and which forms the basis of this action for malicious prosecution was begun, charging Mrs. Bryan with receiving embezzled money feloniously and wilfully, being the money of the Chicago Herald Company, which William S. Bryan had illegally taken into his possession as the agent of the Chicago Herald Company, and had fraudulently and feloniously embezzled and converted to his own use.

It appears that on October 7, 1902, when Mr. Bryan drew the proceeds of the notes out of his bank, he paid the money to his wife on account of his indebtedness to her, and the evidence tends to show that he was indebted to her for various amounts of money theretofore loaned to him by her.

The criminal case against Mrs. Bryan came up for hearing on June 30, 1903, and upon the close of the state's evidence Mrs. Bryan was discharged.

We do not take the time to set out what occurred at the time of the arrest of the plaintiff on this charge, but the evidence tends to show a want of probable cause, and it shows substantial injury.

Alden, Latham & Young, for appellant.

Matz, Fisher & Boyden, for appellees; Dwight S. Bobb, of counsel.

Mr. Presiding Justice Smith delivered the opinion of the court.

The principal question presented to this court on this record is the action of the trial court in giving to the jury at the close of the plaintiff's case a peremptory instruction to find the defendants not guilty. In view of the conclusion which we have reached in this case, we shall not enter into a detailed discussion of the evidence. We think the evidence introduced on behalf of the plaintiff, when taken to be true, together with all legitimate inferences which may be drawn therefrom in favor of the plaintiff, tends to support the cause of action set out in the declaration (Hewes v. C. & E. I. R. R. Co., 217 Ill. 500) and that the court erred in sustaining the motion for a peremptory instruction and instructing the jury to find the defendants not guilty.

In passing upon a motion for a peremptory instruction the question of the preponderance of the evidence does not arise, nor is the court concerned with the weight of the evidence introduced. The fact that different inferences might fairly be drawn from the facts and circumstances shown in evidence is not material. It is only when there is no evidence whatever produced on some material point to sustain a verdict that a court is justified in refusing to submit the case to a jury, and giving a peremptory instruction to find for the defendant. "If there is no evidence, or but a scintilla of evidence, tending to prove the material averments of the declaration, the jury should be directed to return a verdict for the defendant. (Libby, McNeill & Libby v. Cook, 222 Ill. 206, 212)." In Offutt v. Columbia Exposition, 175 Ill. 472, it was said: "Much confusion has doubtless arisen from the different mean-

ings attached to the phrase 'tending to prove,' but giv-
ing it the meaning as held by this court in the Bartlett
case, above cited, that it is evidence upon which the
jury could without acting unreasonably in the eye of
the law, decide in favor of the plaintiff or the party
producing it, most of the apparent conflict between the
different cases disappears.   Thus it was said by Mr.
Justice Maule, in Jewell v. Parr, 13 Com. Bench, 909,
'applying the maxim, *de minimis non curat lex,* when
we say that there is no evidence to go to the jury, we
do not mean that there is literally none, but that there
is none which ought reasonably to satisfy the jury that
the fact sought to be proved is established.   It is of
course true that there are cases where there is literally
no evidence in support of some material and necessary
allegation, but there are many others where there may
be some evidence tending to some remote degree to
support every allegation, yet of too inconclusive and
unsubstantial a character to be the foundation of a ver-
dict.   In either of such cases the court may, when the
question is properly raised, so determine and direct a
verdict as in cases where there is no evidence.   A mere
scintilla of evidence, if it means anything means the
least particle of evidence—evidence which without fur-
ther evidence is a mere trifle—and as the law does not
regard trifles, we see no reason why on such a motion
the court may not adjudge such evidence insufficient
in law, and direct a verdict as in cases where there is
no evidence.' "

Upon a careful review of the evidence in this case,
and carrying in mind the rulings of our Supreme Court
in the above cases, and others cited to us, we are clearly
of the opinion that the evidence offered by the plaint-
iff below, when taken as true, with all legitimate in-
ferences which the jury might draw from it in favor
of the plaintiff, fairly tended to support the cause of
action set out in the declaration, and that the case
should have been submitted to the jury.

Inasmuch as the case must be reversed and the

cause be remanded for a new trial, we deem it just to the parties to refrain from any discussion of the evi-dence which must go before another jury. The trial court and jury should hear the case upon its merits uninfluenced by anything that may be said in disposing of this appeal.

For the error in giving the peremptory instruction the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*